IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>WILLIAM VINCENT CLARKSON,<br>Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:06-CR-734 DAK |

Defendant William Vincent Clarkson has been indicted on possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1).  He filed a motion to suppress evidence obtained by the government during a search of the vehicle that Mr. Clarkson was driving.

For the reasons set forth below, the court finds that the questioning of Mr. Clarkson did not unreasonably extend the scope of the initial traffic stop.  Further, given the facts leading up to the arrest and reasonable inferences drawn from those facts, Officer Sutera had probable cause to search the car that Mr. Clarkson was driving.  Finally, the evidence is admissible because the car would have been impounded and searched as part of the impound process.

## FINDINGS OF FACT[1]

On September 26, 2006, Officer Joseph S. Sutera was watching the residence at 166 East Clayborne Avenue, Salt Lake City, Utah.  The South Salt Lake Police had been monitoring the residence for recent criminal activity, including narcotics dealing, violent crime, prostitution, and

---

[1]The facts are taken from the transcripts of two evidentiary hearings held on March 27 and 28, 2007, and from the hearing on August 10, 2007.

gang activity.  Officer Sutera is a ten-year veteran of law enforcement and is Peace Officers

Standards and Training ("POST") certified.  Officer Sutera also has a bachelor's degree in

criminal justice and psychology.

At 1:10 a.m., Officer Sutera noticed that a Cadillac was parked in front of the residence.

Officer Sutera parked down the street (in his marked car) and ran the Cadillac's license plate

number on his computer.  The computer check showed that the vehicle's registration expired in

July 2006 and that there was no insurance on the vehicle.

Officer Sutera watched a man (later identified as the Defendant William Clarkson) and a

woman leave the residence and get in the Cadillac.  Mr. Clarkson sat in the driver's seat.  The

Cadillac went east, turning onto 200 East.  Officer Sutera followed and called for backup because

he was going to make a traffic stop for the expired registration and no insurance.  Near the

intersection, Officer Sutera turned on the patrol car's lights and Mr. Clarkson stopped the car.

Officer Sutera parked his car behind the Cadillac, aimed his spotlight at the driver's

window, and walked to the car.  Officer Sutera asked Mr. Clarkson to place his hands outside the

window because Officer Sutera was concerned with his own safety "[d]ue to where the car had

come from, I'm always concerned with people having weapons and obviously my own safety."

(Transcript of Mar. 27, 2007 Evidentiary Hearing (hereinafter "Mar. 27 Tr.") 12.)  Mr. Clarkson

identified himself and explained to Officer Sutera that it was his mother's car and that he was

picking up a friend.  Officer Sutera testified that he believed the woman passenger was under the

influence of a narcotic because she had slurred speech and was very fidgety.

When Officer Sutera questioned Mr. Clarkson about the Cadillac's expired registration

and lack of insurance, Mr. Clarkson said his mother knew that he had the car in his possession

but that she did not want him driving it with expired registration.  Mr. Clarkson also

acknowledged that he had put himself in a "poor position" by having been at the residence.  (Id. at 14.)  Officer Sutera ran a computer check on Mr. Clarkson.  Mr. Clarkson had a valid license and no outstanding warrants.

The dispatch screen from Mr. Clarkson's traffic stop stated "do not impound until registration is revoked by D.M.V."  (Id. at 60.)  But Officer Sutera testified that this refers to a state tax impound for no insurance and in no way prohibits him from impounding the vehicle. Officer Sutera testified: "[t]hat means that based on the no insurance, that is not a state taxable impound until they revoke the insurance.  That doesn't say anything about the . . . expired registration, nor does that preclude me from impounding the vehicle, hold for owner."  (Id.) Further, he clarified that:

> With a state tax impound there is a violation that they want—they want the vehicle impounded so the state can take care of either registration issues or insurance issues or improperly registered vehicle type issues.  That does not preclude us from doing a hold for owner impound, where that—in that case the person that owns the car doesn't have to go to the D.M.V. and take care of any registration issues.  They just have to go back to the impound yard, the registered owner, and pick it up.

(Id. at 62.)  Officer Sutera testified that driving without insurance and an expired registration are misdemeanors under Utah law and that, under these circumstances, he would typically impound the vehicle.  And that before impounding the vehicle, a roadside inventory search would be done and all closed containers within the vehicle would be opened.  Officer Sutera testified that he has done both—impound and not impound a vehicle–when a driver has no insurance and an expired registration.

About two minutes after Officer Sutera called for backup, Officer Jim Anderson (a four-

year veteran of law enforcement) arrived at the scene with the K-9 patrol dog "Oso" in tow.[2]
Officer Anderson has been a certified K-9 handler for three years and a patrol officer.  Officer
Anderson has worked with two dogs as a canine officer.  Officer Anderson underwent three
months of patrol training and an eight-week course for narcotics training.  In addition, he
participates in about ten hours a week of maintenance training in K-9 narcotics.

Oso is not a certified narcotics dog, but Oso had undergone almost ten weeks of narcotics
training with Officer Anderson.  Oso did not complete the eight-week narcotics certification
course due to an injury.  Before Oso's injury, Oso had also completed about two weeks of
ongoing training.  Officer Anderson stated that, in his opinion as a K-9 instructor, Oso was
capable and qualified of detecting narcotics as of September 26, 2006.  Officer Anderson also
testified that another K-9 narcotics instructor, Mr. Wendell Nope, who is the head of the Utah
POST and certifies dogs for the state, told him that Oso was qualified and certifiable as a
narcotics dog before Oso's injury.

Mr. Clarkson called Mr. Steven Nicely to testify regarding the training of narcotics dogs.
Mr. Nicely was a credible and knowledgeable witness.  Mr. Nicely testified that he believed Oso
was not a qualified narcotics dog.  According to Mr. Nicely, there were a number of errors made
by Oso and Officer Anderson during Oso's inspection of the Cadillac.  The government was
prepared to offer Mr. Nope's testimony that Oso was qualified and reliable.[3]

Officer Anderson testified that when he arrived at Mr. Clarkson's traffic stop, "I noticed
the vehicle, an older style Cadillac, light in color, cream in color.  Several days prior I had been

---

[2]Officer Anderson testified that he arrived on the scene approximately two minutes after
Mr. Clarkson was pulled over.  (See Transcript of Mar. 28, 2007 Evidentiary Hearing 16.)

[3]But whether Oso was fully qualified or not is not dispositive to Mr. Clarkson's motion to
suppress and the court need not make that determination in this case.

the initial officer of a robbery in which a gentlemen was beat up and pistol whipped with a handgun.  They took his money, and that's the description of the vehicle that he gave."  (Id. at 71.)  The suspects from the armed robbery were two African American men.  Mr. Clarkson is also African American.  Officer Anderson stated that "because that vehicle [Mr. Clarkson's] was, you know, only a few blocks from the area, I felt that might be the suspect vehicle."  (Id.)  Accordingly, Officer Anderson was concerned for his safety and told Officer Sutera that a "vehicle similar in description" was used a few nights ago in an armed robbery.  (Id. at 18-19.)

Officer Sutera testified that, at this point, he was concerned about weapons in the car.  Upon re-approaching Mr. Clarkson's car, Officer Sutera asked Mr. Clarkson if he would get out of the Cadillac and if he could check to verify that he didn't any weapons.  Mr. Clarkson agreed.  Officer Sutera preformed a pat-down of Mr. Clarkson and found no weapons.  Officer Sutera continued his questioning of Mr. Clarkson and was planning to ask Mr. Clarkson for consent to search the Cadillac while Oso sniffed the Cadillac's exterior.

Soon after beginning the search for narcotics, Oso indicated for the presence of narcotics on the exterior of the front passenger-side door.  At this point, Mr. Clarkson had been pulled over for slightly more than thirteen minutes.  After Oso indicated, Officer Anderson allowed Oso into the vehicle to further search: "[a]t that point he went directly into the vehicle, [and] indicated on the passenger and the driver's seat."  (Id. at 74-75.)

After Oso's indication, Officer Sutera told Mr. Clarkson that his car would be searched.  Officer Sutera started his search on the driver's side, where he located a fanny pack on the driver's seat.  Officer Sutera testified that "I lifted up the fanny pack, felt an abnormally heavy object in there, which I basically immediately figured was probably a handgun of some sort."  (Id. at 25.)  Officer Sutera unzipped the fanny pack and located a Ruger semiautomatic handgun.

5

He also found a glass pipe in the fanny pack, which he testified is "normally [is] used for smoking crack cocaine.  (Id. at 26.)  Officer Sutera also found other crack pipes in the car.

## CONCLUSIONS OF LAW

In his motion to suppress, Mr. Clarkson seeks the suppression of the Ruger handgun and the drug paraphernalia found in the fanny pack.

## 1.    Reasonable Suspicion of Criminal Activity

Mr. Clarkson does not challenge the permissibility of his initial stop.  Rather, Mr. Clarkson argues that Officer Sutera unreasonably exceeded the scope of the traffic stop.  Even assuming that the stop was prolonged, which it was not, it was not unreasonable because Officer Sutera had reasonable articulable suspicion that Mr. Clarkson was engaged in criminal activity.

"A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  Illinois v. Caballes, 543 U.S. 405, 407 (2005).  Questioning that prolongs the length of a traffic stop is permissible if either the defendant grants consent or if the officer has a reasonable suspicion of criminal activity.  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1259 (10th Cir. 2006).  An officer may engage in other questioning as long as it does "not appreciably lengthen the detention."  Id.  Reasonable suspicion exists when there is a "particularized and objective basis for suspecting criminal activity."  United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002).  In evaluating whether an officer had reasonable suspicion, the Tenth Circuit considers the totality of the circumstances.  United States v. Arvizu, 534 U.S. 266, 274 (2002).  "A factor may contribute to reasonable suspicion even if it 'is not by itself proof of any illegal conduct and is quite consistent with innocent travel.'"  United States v. Valles, 292 F.3d 678, 680 (10th Cir. 2002) (quoting United States v. Sokolow, 490 U.S. 1, 9 (1989)).

Officer Sutera testified that he was concerned that Mr. Clarkson had weapons in the car. Moreover, Officer Sutera had reasonable articulable suspicion that Mr. Clarkson had been involved in the robbery. Here, the totality of the circumstances gives rise to a reasonable suspicion that Mr. Clarkson was involved in criminal activity.

First, Mr. Clarkson had come from a residence known for crime and drug problems in a neighborhood known for gang activity. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a Terry analysis."); United States v. Solo-Cervantes, 138 F.3d 1319, 1323 (10th Cir. 1998) ("While the fact that an individual is in a neighborhood known for drug activity is not sufficient by itself to support a reasonable suspicion that the individual himself is engaged in criminal activity, it can support a finding of reasonable suspicion when combined with other factors.") (citation omitted).

Second, the stop occurred around 1:10 a.m. in the morning. See United States v. Barbee, 968 F.2d 1026, 1029 (10th Cir. 1992) (considering that vehicle "was traveling in the evening, after dark" as one factor to support reasonable suspicion).

Third, there was evidence that Mr. Clarkson might be one of the suspects in a recent robbery. In that robbery, a man was beaten and pistol whipped with a handgun. Officer Anderson testified that when he arrived at Mr. Clarkson's traffic stop, "I noticed the vehicle, an older style Cadillac, light in color, cream in color," which matched the description of the vehicle from the armed robbery. (Mar. 27 Tr. at 71.) Officer Anderson testified that the car used in the robbery was a "solid cream-colored vehicle." (Id.) Officer Sutera stated that Mr. Clarkson's car is a "lightish yellow Cadillac." (Id. at 19.)

Mr. Clarkson's vehicle was only a few blocks away from where the armed robbery

occurred.  The suspects from the robbery were two African American men, as is Mr. Clarkson.

Finally, Mr. Clarkson's female passenger appeared to Officer Sutera to be under the influence of narcotics.

In addition to these objective facts, Officer Sutera and Officer Anderson offered credible and reliable testimony that they were concerned for their safety.  Accordingly, the pat-down and continued questioning of Mr. Clarkson was reasonable under the Fourth Amendment.

Significantly, Mr. Clarkson's traffic stop was not prolonged by Officer Sutera's questioning or the dog sniff.  The Tenth Circuit has found traffic stops longer than thirteen minutes to be reasonable.  See United States v. Yeomans, No. 06-1037, 2007 WL 30032, at *5 n.9 (10th Cir. Jan. 5, 2007); United States v. Briseno, 163 Fed. Appx. 658, 664 (10th Cir. 2006).

The total time that elapsed between the time Officer Sutera stopped Mr. Clarkson at the side of the road to the time Oso first alerted to the presence of narcotics on Mr. Clarkson's car was about thirteen and one-half minutes, which is acceptable under Tenth Circuit law.

**2.      Probable Cause**

Soon after beginning the search for narcotics, Oso indicated for the presence of narcotics on the exterior of the front passenger-side door, giving Officer Sutera probable cause to search the car.  The Fourth Amendment does not require that police obtain a warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity.  Warrantless Searches and Seizures, 35 Geo. L.J. Ann. Rev. Crim. Proc. 37, 93 (2006).  Although a warrant is normally required before a search of a person's car may be conducted, a positive indication by a drug dog serves to provide probable cause for a search, absent a warrant.  United States v. Rosborough, 366 F.3d 1145, 1152 (10th Cir. 2004).  This is so even when the dog alert occurs during a warrantless sniff 'on the exterior of the vehicle during a

8

lawful traffic stop.' United States v. Stewart, 473 F.3d 1265, 1270 (10th Cir. 2007) (quoting Caballes, 543 U.S. at 409).

Neither the Supreme Court nor the Tenth Circuit have articulated an exact standard for sufficient qualification of a drug dog.  The Caballes Court indicates that a sniff should be performed by a "well-trained narcotics-detection dog."  Caballes, 543 U.S. at 409.  The Tenth Circuit has stated that a dog must be "well-trained"[4] "trained"[5] or "properly trained"[6] or otherwise "qualified."[7]  There is no precedent that requires certification in order for a dog to be found trained or qualified.

Oso was never certified as a narcotics detection dog, but he did undergo almost all of the requisite training, as well as ongoing narcotics detection training with Officer Anderson.  Both Officer Anderson, who is a certified narcotics dog trainer, and Mr. Nope, the head of the Utah POST course and a certified narcotics dog trainer, said that Oso was qualified to certify as a narcotics detection dog.  And although Mr. Nicely testified that Oso was not a qualified narcotics dog and that his indication was not reliable, there is no evidence or suggestion that Officer Sutera knew that Oso was not reliable.

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  In addition to the factors which gave rise to a reasonable suspicion that Mr. Clarkson was involved in criminal activity, Officer Sutera reasonably relied on Oso's indication, even if mistaken, which provided

---

[4]United States v. Morales-Zamora, 914 F.2d 200, 203 (10th Cir. 1990).

[5]United States v. Cantu, 405 F.3d 1173, 1179 (10th Cir. 2005).

[6]United States v. Mendoza, 468 F.3d 1256, 1261 (10th Cir. 2006).

[7]United States v. Tueller, 349 F.3d 1239, 1242 (10th Cir. 2003).

him with probable cause to search.  The determination of reasonableness is a question of law.
United States v. Parker, 72 F.3d 1444, 1449 (10th Cir. 1995).  Courts are to view the officer's
conduct through a filter of "common sense and ordinary experience" and in light of the totality of
the circumstances.  United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995), cert. denied,
517 U.S. 1143 (1996) (quoting United States v. Garcia, 28 F.3d 1046, 1052 (10th Cir. 1991).)
Further, courts must "avoid unrealistic second-guessing of police officers 'decisions and . . .
accord appropriate deference to the ability of a trained law enforcement officer . . . .'" United
States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997) (quoting Alvarez, 68 F.3d at 1244.))
Officer Sutera reasonably relied on Oso's indication and there is no evidence to suggest that
Officer Sutera knew that Oso may not be reliable.

 For the reasons stated above, the court finds that Officer Sutera objectively and
reasonably relied on Oso's indication and the other factors that caused him to suspect that Mr.
Clarkson was involved in the robbery, which gave him probable cause to search Mr. Clarkson's
car.

**3.** **Inventory Search**

 Even if Officer Sutera did not have probable cause to search Mr. Clarkson's car, the
evidence would have been discovered and admissible under the inevitable discovery doctrine.

 Utah authorizes "[a] peace officer [to] make an arrest . . . without warrant . . . (1) for any
public offense committed . . . in the presence of any peace officer . . . ."  Utah Code Ann. §
77-7-2 (2006) (emphasis added).  The Utah Supreme Court has explained that "[t]he term 'public
offense' under section 77-7-2(1) generally includes misdemeanors."  State v. Trane, 2002 UT 97,
¶ 29, 57 P.3d 1052 (citing Oleson v. Pincock, 251 P. 23, 24-25 (Utah 1926) ("The term public
offense, in view of other provisions in the statute, necessarily includes every public offense

constituting a misdemeanor.")).

Similarly, the Tenth Circuit has ruled that Utah policemen are authorized to arrest drivers for class C misdemeanor traffic violations. <u>United States v. Lugo</u>, 170 F.3d 996, 1003 (10th Cir. 1999). Specifically, the circuit court found "a legitimate basis to arrest" because "the officer observed that [defendant] was speeding and operating a vehicle without a valid driver's license." <u>Id.</u> Since the officer had sufficient cause to arrest, the <u>Lugo</u> court upheld the denial of defendant's motion to suppress evidence seized contemporaneously to that arrest. <u>Id.</u>; <u>see also</u> <u>Maryland v. Pringle</u>, 540 U.S. 366, 370 (2003) ("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause"); <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 340 (2001) ("We simply cannot conclude that the Fourth Amendment, as originally understood, forbade peace officers to arrest without a warrant for misdemeanors not amounting to or involving breach of the peace.").

Because Mr. Clarkson was driving with an expired registration and no insurance, which are misdemeanors, Officer Sutera had the authority to arrest Mr. Clarkson. <u>See</u> Utah Code Ann. § 41-12a-303.2 (2006); Utah Code Ann. § 41-1a-1303 (2006). Moreover, Mr. Clarkson could not have lawfully driven the vehicle because of these violations and his passenger was apparently impaired and could not have driven the car. Courts have upheld inventory searches of vehicles lawfully in police custody. <u>United States v. Johnson</u>, 734 F.2d 503, 505 (10th Cir. 1984) (vehicle lawfully in police custody because driver was intoxicated and car was about to be towed).

"The inevitable discovery doctrine provides an exception to the exclusionary rule … and permits evidence to be included 'if an independent, lawful police investigation inevitably would

have inevitably discovered it.'" <u>United States v. Cunningham</u>, 413 F.3d 1199, 1203 (10th Cir. 2005). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." <u>Id.</u> (citing <u>United States v. Souza</u>, 223 F.3d 1197 (10th Cir. 2003)). "An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment .… Consequently, if evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." <u>United States v. Ibarra</u>, 955 F.2d 1405, 1410 (10th Cir. 1992) (citations omitted).

Accordingly, because Mr. Clarkson's car would have been impounded, and all containers within it would have been opened, the evidence found in the car would be admissible under the inevitable discovery doctrine.

### ORDER

For the foregoing reasons, the court orders as follows:

Defendant William Vincent Clarkson's First Motion to Suppress (Dkt # 17) is DENIED.

DATED this 20th day of August, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge